*447 Statement of the Case.
MONROE, J.
The plaintiffs are suing for damages for the killing of their son through the alleged negligence of the defendant. The answer is a denial of liability. Upon the first hearing of the case in the district court there was a mistrial, and upon the second a verdict and judgment for $2,500, from which the defendant has appealed. It appears from the evidence that Rabley Lloyd, the plaintiffs’ son (a young man about 18 or 19 years of age), James Galloway, his cousin, and James Crow, started out on the morning of Sunday, March 19, 1900, and rambled about the country in the neighborhood in which they lived, for the most part together, doing nothing of consequence, so far as the record shows, and that at about 5 o’clock in the afternoon they found themselves near the defendant’s road, not far from Covington, in the parish of St. Tammany. Young Lloyd was at that time very much intoxicated— so much so that, to use the expression of his cousin, he was “past going” — and his companions left him lying on the ground at a point about 50 or 60 feet from the railroad track. An hour or so later he was lying face downward across one of the rails, with his hip and legs between the ends of two cross-tics, outside the rail, his abdomen pressed down over the rail, and his body and head between the same ties inside of the rail; i. e., between the two rails. It also appears that the defendant was engaged in repairing and ballasting its road; that the earth had been taken up from between the ties referred to; that ties, for the purposes of the repairs, had been scattered along quite close to the track; that two of them had fallen, one across the other, near the place where Lloyd was lying; and that, altogether, he was not a conspicuous object to one approaching on the track from the direction of Pearl River. In that condition he was run over and killed by defendant’s engine No. 6, running, with only its tender, from Pearl River to Covington. That engine had left Pearl River in charge of Seymour, engineer, and Crawford, fireman, and had on board, as passengers, Hestrest, Rubion, Strobel, Collins, and Ladiner — persons employed by the defendant in different capacities, who, as we infer, were returning to their respective homes. The engine was making between 20 and 25 miles an hour. The track at the point where the accident occurred was straight and comparatively 'level, with a slight up grade in the direction of Covington, though the engineer testifies, without contradiction, that just at the point where Lloyd was lying there was a slight depression. The. engineer was at his post, which happened to be on the side upon which Lloyd was lying; the fireman was standing near him; Rubion was occupying the fireman’s seat, on the opposite side of the cab-, and the other members of the party were scattered about in available places, either in the cab of the engine or on the tender. These were the only persons who were present when the accident occurred, and the only ones who testify concerning it. They say that night was coming on, and that, whilst they were unable to see or distinguish objects at anjr great distance by the waning light of the day, there was just enough of that light to prevent the artificial light on the engine from being effective. The engineer testifies (and he is corroborated by several of the witnesses, and contradicted by none) that he was keeping a lookout in front, but that he did not see the object on the track until he was within 100 feet, and did not recognize it as the body of a man until he was within 25 feet, of it, and that the moment he saw it he used every means in his power to stop the engine; i. e., he shut off steam with one hand, applied the emergency brake with the other, and opened the cylinder cocks with his foot; the effect being that the engine was stopped so quickly that some of those on board were thrown from their positions — one, into the coal on the tender; and another, to the ground. It is shown that the engine had been sent to the shop for repairs on the 29th of January, and had been turned out, in good condition, only one week before the accident. It is also shown that, on the day of and preceding the accident, a brake shoe intended for use upon one of the wheels of the tender had dropped off, but that upon the engine and tender there are 12 wheels, the brake shoes belonging to 11 of which remained in position, and that the brake head from which the shoe in question dropped was almost, if not quite, as effective without the shoe as with it. It is further shown that young Lloyd was a chronic invalid, suffering *449 from asthma, that the paroxysms of the disease sometimes rendered him temporarily helpless; and that he was rather deaf. Beyond this, there is some testimony in the record to the effect that there were certain wounds on the body which did not appear to have resulted from the accident, that but little blood seemed to have been shed, and that the unfortunate young man was quite dead when those upon the engine reached him, which they did almost immediately. It further appears that in March, 1901, after the jury had disagreed, upon the first trial of the case, the plaintiff Jacob Lloyd, with two friends (Davenport and Sticker), went upon the defendant’s track at about the hour at which the accident had occurred, though at a different place, and experimented with a view of ascertaining at what distance the recumbent body of a man could be seen. We make the following excerpts from the testimony given by them on the subject:
Jacob Lloyd: “Q. Did you have occasion, with the naked eye, to observe how far you were able to see an object on the track of the railroad company? (Objection and ruling.) A. Yes, sir. Q. How far could you see an object, and what object was it? * * * A. I seen the object. They stepped it — 250 feet. I couldn’t state what the object was at that distance. I am sixty-two, and my eyes are not good,” etc.
Joe Davenport: “Q. Answer the question: Were you able to see a man, and at what distance? A. Yes, sir; I think they stepped it, and it was a hundred and fifty steps, if I mistake not. I never stepped it. I stood where they started from, and Mr. Sticker stepped it, and went up and lay down.” And his examination proceeds as follows:
“Q. Were you able to see him? A. Yes, sir. Q. Could see it was a man? A. Yes, sir; I could see his hat lying ahead of him. I could tell there was something above his head. He lay down across the track. Q. Could you see it plain, or only indistinctly? A. I couldn’t see it myself. I was low. I couldn’t see for certain it was a man, but I could see a bulk of something lying there— I couldn’t tell exactly what; but I am a very low man.”
Martin Sticker: “Q. Answer the question: Were you able to see? A. Well, I suppose I would have, if I had looked. I was the man laid down on the track. I was not doing the looking. I was lying on the track. Q. How far were you on the track from Joe Davenport? A. I was a hundred and fifty steps.”
Opinion.
The only witnesses who were present at the accident, and who testify concerning it, are the defendant’s employes; but, unless their testimony is to be believed, the plaintiffs have no case, because there is no other going to show that their son was run over by the engine; and yet, if we believe that testimony, the plaintiffs have no case, because it exonerates the defendant from blame. The story told by those witnesses is, however, plain and consistent, and is not affected by the testimony of the plaintiff and his witnesses as to the experiment made by them in March, 1901. In the one case, we know that a boy, whose presence was entirely unsuspected, was lying, with the upper part of his body, as also his hips and legs, in a space, from which the earth had been removed, between two cross-ties; that his abdomen was flattened across the rail; and that he was seen, in the twilight, by the defendant’s employés, whilst they were approaching, at the rate of 20 or 25 miles an hour, at a distance of 100 feet. In the other case, we are not told how large Mr. Sticker is, or whether he laid himself between the ties, or on them; and we are informed that the other parties to the experiment had the advantage not only of knowing that he was there, but that they followed him with their eyes from the moment that he left them until he reached his destination, and assumed the position that they expected him to take. Without going into other particulars, therefore, the conditions are so different that the experiment is of no value, and we are obliged to fall back upon the direct, positive, and uncontradicted testimony to the effect that the defendant’s employSs were guilty of no negligence, either in the matter of keeping a lookout, or in endeavoring to avoid the accident after the discovery of the danger. Under these circumstances, there is no principle of law and no precedent which would authorize a judgment for the plaintiffs.
It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed *451 from be annulled, avoided, and reversed, and that plaintiffs’ demand be rejected at their cost in both courts.